WILLIE LEE BROWN, JR. *v.* STATE OF MARYLAND

[No. 400, September Term, 1971.]

*Decided July 3, 1972.*

The cause was submitted on briefs to ORTH, MOYLAN and GILBERT, JJ.

Submitted by *Harry Sadoff* for appellant.

Submitted by *Francis B. Burch, Attorney General, James G. Klair, Assistant Attorney General,* and *William B. Yates, State's Attorney for Dorchester County,* for appellee.

MOYLAN, J., delivered the opinion of the Court.

A review of the convictions for storehouse breaking and larceny of the appellant, Willie Lee Brown, Jr., in the Circuit Court for Dorchester County by a jury, presided over by Judge C. Burnam Mace, poses squarely the question, "When is 'open view' not 'Plain View'?"

The "Plain View Doctrine" is simply that it is constitutionally reasonable for the authorities to seize objects come upon by inadvertence during a valid prior intrusion.

### *The Emergence of a "Plain View" Doctrine*

Although Justice Stewart's references to a "plain view

586

doctrine" seem to imply something of reasonably venerable lineage, historical analysis reveals that the doctrine, as a recognized doctrine, sprang full-blown from his plurality opinion in *Coolidge v. New Hampshire,* 403 U. S. 443.[1] There had been, to be sure, intimations but nothing resembling a body of doctrine.

The "Plain View Doctrine" is a newly recognized exception to a fundamental proposition. That proposition is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U. S. 347, 357; *Coolidge v. New Hampshire, supra,* at 454-455. In referring to the "few specifically established and well-delineated exceptions," the Supreme Court has been careful not to close the category but had, prior to *Coolidge,* spe-

---

1. We conclude that on the subject of the "Plain View" Doctrine, Justice Stewart was speaking for five members of the Court and, therefore, announcing "the law of the land." Justices Douglas, Brennan and Marshall joined in the Stewart opinion. It is the cryptic concurrence of Justice Harlan, the necessary fifth vote, that necessitates textual exegesis to determine just what parts of Justice Stewart's opinion are constitutionally binding and what parts are merely constitutionally persuasive. The Stewart opinion is in three major divisions. Part I deals with the question of what governmental officer may issue a search warrant. Part III deals with the consent of a defendant's spouse to a search of their jointly-owned property. Neither of those parts concerns us here. Part II deals with exceptions to the warrant requirement for a valid search and is, in turn, subdivided into four sub-parts. II-A deals with the question of "search incident to a lawful arrest." II-B deals with the so-called "automobile exception." II-C deals with "plain view." II-D is a rebuttal to the dissent of Justice White. After generally lamenting the continuing vitality of *Mapp v. Ohio,* 367 U. S. 643, and *Ker v. California,* 374 U. S. 23, which he would prefer to see overruled, Justice Harlan concurs in Parts I, II-D, and III of the Stewart opinion. He says nothing to disavow the positions taken in II-A, II-B or II-C, but pointedly omits to concur. Part II-D, in which Justice Harlan does concur, however, is a defense by Justice Stewart of the positions espoused in II-B and II-C from the attack made on those positions by Justice White in dissent. Albeit belatedly, Justice Harlan is thereby in ranks for the reaffirmation of Justice Stewart's "plain view" doctrine. See La Fave, "Warrantless Searches and the Supreme Court: Further Ventures Into the 'Quagmire'," 8 *Criminal Law Bulletin* 9, 25, n. 59.

cifically listed only the "automobile search"[2] and the "search incidental to a lawful arrest,"[3] with the very late addition of "exigent circumstances"[4] to the roster. *Katz*, at 357, n. 19. See also Landynski, *Search and Seizure and the Supreme Court* (1966), Chapter IV, "Constitutional Searches without Warrant"; Landynski, "The Supreme Court's Search for Fourth Amendment Standards: The Warrantless Search," 45 Conn. Bar Journal 2 (1971).

Although now apparently an autonomous "exception" in its own right the "Plain View Doctrine" had obscure beginnings as a marginal factor in the "search incident" law and its early growth went largely unnoticed.[5] Its seedtime cannot be understood apart from the "search incident" context that generated it initially and was its sole early nutrience. It was a mere descriptive phrase— sometimes "plain view", sometimes "plain sight", sometimes "open view", sometimes "visible and accessible", and always in lower case—in the recurring ebb and flow of "search incident" law. It was generally resorted to during the ebb tides to distinguish away and to minimize the significance of the preceding flood tides. Its tactical utility and its growth can only be understood by looking to the larger fortunes of that "search incident" war.

Fourth Amendment law generally attracted little at-

---

2. First recognized in *Carroll v. United States*, 267 U. S. 132 (1925). See *Husty v. United States*, 282 U. S. 694; *Scher v. United States*, 305 U. S. 251; *Brinegar v. United States*, 338 U. S. 160; *Preston v. United States*, 376 U. S. 364; *Cooper v. California*, 386 U. S. 58; *Dyke v. Taylor Implement Manufacturing Co.*, 391 U. S. 216; *Chambers v. Maroney*, 399 U. S. 42; *Coolidge v. New Hampshire, supra*, at 458-464. See also Comment, "Auto Search: The Rocky Road from Carroll to Coolidge," 17 S.D.L. Rev. 98 (1972).

3. First applied by the Supreme Court in *Marron v. United States*, 275 U. S. 192 (1927), although presaged by dicta in *Weeks v. United States*, 232 U. S. 383 (1914); *Carroll v. United States, supra;* and *Agnello v. United States*, 269 U. S. 20 (1925).

4. *Warden v. Hayden*, 387 U. S. 294 (1967), (the exigent circumstance in this case was "hot pursuit").

5. Its literature is remarkably spare even today. See LaFave, *op. cit.*, pp. 24-26; "The Supreme Court, 1970 Term," 85 Harv. L. Rev. 3, 243-248; Kuipers, "Suspicious Objects, Probable Cause, and the Law of Search and Seizure," 21 Drake L. Rev. 252, 263-267 (1972); Note, "The United States Courts of Appeals: 1970-1971 Term—Criminal Law and Procedure," 60 Geo. L. J. 281, 304-307 (1971).

tention until the exclusionary rule made it a factor in criminal litigation.[6] Even then, the Supreme Court had infrequent occasion to concern itself with search and seizure questions until the adoption of laws in and immediately preceding the 1920's proscribing the sale and possession of narcotic drugs and of alcoholic beverages.[7] Landynski, *Search and Seizure and the Supreme Court*, 87-88; Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937). With the coming of the Prohibition cases, however, the deluge began.

The common law right to search an arrestee as an incident of lawful arrest, be that arrest warrantless or pursuant to warrant, was early accepted as compatible with American concepts of reasonable search and seizure. See Judge Cardozo in *People v. Chiagles*, 237 N. Y. 193, 196 (1923) ; *United States v. Rabinowitz*, 339 U. S. 56 (1950), 72 (dissenting opinion by Frankfurter, J.). The controversy that raged in the Supreme Court from 1927 through 1969 was over the permissible scope—the range in space—the search perimeter—of an admittedly proper "search incident." Five times in forty-two years, the Court reversed its field, producing six sharply juxtaposed phases of permitted scope to a "search incident." Three periods of broad scope—1927 to 1931,[8] 1947 to 1948 [9] and

---

6. The exclusionary rule was first employed to bar improperly seized evidence from a criminal trial in Vermont in 1901. *State v. Slamon*, 50 A. 1097. Vermont virtually discarded the technique four years later, however. *State v. Krinski*, 62 A. 37. In 1903, Iowa adopted the first exclusionary rule that has endured. *State v. Sheridan*, 96 N. W. 730. The Federal Government adopted the exclusionary rule for Federal trials in 1914. *Weeks v. United States, supra.* The exclusionary rule was raised to constitutional status and made applicable to the states in 1961 by *Mapp v. Ohio, supra*, implementing *Wolf v. Colorado*, 338 U. S. 25, which had incorporated the Fourth Amendment into the "due process" clause of the Fourteenth Amendment in 1949.

7. Professor Zechariah Chafee, Jr., wryly remarked that the interpretation of the search and seizure provision "received new life from the fact that infractions of the Fourth Amendment frequently interfere[d] with the consumption of liquor in violation of the Eighteenth Amendment." "The Progress of the Law, 1919-1922," 35 Harv. L. Rev. 673, 694 (1922).

8. *Marron v. United States, supra.*

9. *Harris v. United States*, 331 U. S. 145 (1947).

1950 to 1969 [10]—alternated with three periods of narrow scope—1931 to 1947,[11] 1948 to 1950 [12] and 1969 to present.[13] The very concept of "Plain View" is a by-product of that controversy, a notion that gradually evolved to help fill the interstice between the otherwise rigidly bipolar positions of "broad scope" and "limited scope."

The reasons of necessity which underlay the right to search an arrested person incidental to the arrest were 1) to protect the arresting officer and to deprive the prisoner of potential means of escape, *Closson v. Morrison,* 47 N. H. 482 (1867), and 2) to avoid the destruction of evidence by the arrested person, *Reifsnyder v. Lee,* 44 Iowa 101 (1876) ; *Holker v. Hennessey,* 141 Mo. 527 (1897). See *Rabinowitz,* at 72-73 (dissenting opinion by Frankfurter, J.). Without analyzing the purpose of the rule, the Supreme Court, in a passing dictum, first acknowledged its existence in *Weeks v. United States, supra,*[14] at 392:

> "What, then, is the present case? Before answering that inquiry specifically, it may be well by a process of exclusion to state what it is not. It is not an assertion of the right on the part of the government, always recognized under English and American law, *to search the person of the accused* when legally arrested, to discover and seize the fruits or evidences of crime. This right has been uniformly maintained in many cases." (Emphasis supplied)

Eleven years later, the Supreme Court again made passing reference to the "search incident" rule in a dictum in *Carroll v. United States, supra.*[15] It cited its ear-

---

10. *United States v. Rabinowitz, supra.*
11. *Go-Bart Importing Company v. United States,* 282 U. S. 344 (1931).
12. *Trupiano v. United States,* 334 U. S. 699 (1948).
13. *Chimel v. California,* 395 U. S. 752 (1969).
14. The holding of *Weeks* was that the exclusionary rule would be utilized to bar unconstitutionally seized evidence from Federal trials.
15. The holding of *Carroll* was that probable cause plus exigent circumstances may justify the warrantless search of an automobile.

lier dictum in *Weeks* but after the words "upon his person" added the words "or in his control." The added words, however, were in accord with the common law tradition and were but an explicit statement of what was implicit in *Weeks*. The Court said, at 158:

> "When a man is legally arrested for an offense, whatever is found *upon his person or in his control* which it is unlawful for him to have, and which may be used to prove the offense, may be seized and held as evidence in the prosecution." (Emphasis supplied)

The germ of later controversy appeared seven months thence as an uncritical dictum in *Agnello v. United States, supra.* Citing only *Weeks* and *Carroll* as authority, the Court loosely added to the proposition the words "and to search the place where the arrest is made." It said, at 30:

> "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime, *and to search the place where the arrest is made* in order to find and seize things connected with the crime as its fruits, or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted. See *Carroll v. United States, . . . Weeks v. United States."* (Emphasis supplied)

A close reading of the obvious purpose of the Court in referring to "the place where the arrest was made" would have precluded undue significance being given to that phrase. *Agnello* was not dealing with the question of the permitted scope of a "search incident" at the place where the actual arrest was made. Its clear holding, rather, was that an arrest at one place (whatever "search incident" was there permitted) could in no event justify a "search incident" at another place some blocks away. In such a factual and legal posture, the Court's use of

the word "place" should not have been read overbroadly. Two years later, however, the Court did read *Agnello* overbroadly in *Marron v. United States, supra.*[16]

In *Marron,* Prohibition agents were executing a warrant authorizing the search for and seizure of intoxicating liquors and articles used in their manufacture. They went to execute the warrant in a second-floor establishment containing six or seven rooms. While executing the warrant, they found violations of the liquor laws being perpetrated in their presence. In searching a closet for liquor, they noticed and seized a ledger which significantly inculpated the defendants. The government advanced two rationales to justify the seizure of the ledger. The Supreme Court rejected the first, but accepted the second. It specifically held that a proper search under a warrant could not justify the seizure of the ledger which had been inadvertently discovered in the course of the legitimate search because the ledger had not been particularly described. It went on, however, to assert a second and legitimate rationale. The discovery by the agents of violations being perpetrated in their presence justified arrests, which were made. The ledger, which was not seizable under the warrant, was seizable as an incident of the lawful arrest. In asserting a broad scope for a "search incident," the Court relied on *Agnello, Carroll* and *Weeks* and said, at 199:

> "The authority of officers to search and seize the things by which the nuisance was being maintained *extended to all parts of the premises* used for the unlawful purpose." (Emphasis supplied)

No mention was made of "plain view." It was the clear holding of the Court, rather, that the scope of a "search

---

16. Justice Frankfurter characterized the "progressive distortion" from *Weeks* to *Carroll* to *Agnello* to *Marron,* "These decisions do not justify . . . [the ultimate] decision. They merely prove how a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision." *Rabinowitz,* at 75.

incident" extended to the entire premises in which an arrest is made.[17]

Four years later, the Court turned a sharp "about face" in *Go-Bart Importing Company v. United States, supra,* and remained steadfast a year later in *United States v. Lefkowitz,* 285 U. S. 452 (1932). In both cases, arrests were made in places of business. Searches were made of the premises as incidents of the lawful arrests. In *Go-Bart,* defendants were compelled to open a desk and a safe, from which incriminating papers were seized. In *Lefkowitz,* two desks were searched which yielded incriminating evidence. Although both searches would appear to have been legitimate under *Marron,* they were held to be unconstitutional. Rather than frankly overrule *Marron,* the Court attempted to distinguish it in two respects.[18] It pointed out first that the ledger in *Marron* was an "instrumentality" of the crime, whereas the seized papers in *Go-Bart* and *Lefkowitz* were "mere evidence." [19] It then essentially rewrote the rationale of *Marron* by injecting for the first time the notion of "plain view" into *Marron's* reasoning. It condemned the "general exploratory search," "the ransacking," and "the rummaging" of the *Go-Bart* and *Lefkowitz* searches and posited that, by way of contrast, *Marron* had not, in fact, authorized such general searches. *Go-Bart* pointed out that the seized ledger in *Marron* had been "visible and accessible;" [20] *Lefkowitz* characterized

17. Indeed, the very notion of "plain view" is completely moot during periods of broad scope of a "search incident," since the more extensive and intensive right to make a thorough search of an entire premises subsumes the lesser right to make a mere seizure of those things in "plain view" therein.

18. A certain license to reinterpret history presumably stemmed from the fact that the *Marron, Go-Bart* and *Lefkowitz* opinions were all by a unanimous court and were all authored by Justice Butler, who also wrote the *Agnello* opinion.

19. The illogical distinction between "fruits of crime, instrumentalities of crime and contraband," on the one hand, and "mere evidence," on the other hand, which first appeared in 1921 in *Gouled v. United States,* 255 U. S. 298, was finally laid to rest in 1967 in *Warden v. Hayden, supra,* under the intellectual sledgehammers of Chief Justice Traynor in *People v. Thayer,* 63 Cal. 2d 635, and Chief Judge Weintraub in *State v. Bisaccia,* 45 N. J. 504.

20. *Go-Bart,* p. 358.

the seized ledger in *Marron* as having been "in plain view" [21]—this visibility was now offered as the justification for the seizure.[22]

In 1947, the Court moved back into forward gear with its 5-4 decision in *Harris v. United States*, 331 U. S. 145. It there permitted the most extensive and intensive "search incident" in the history of Fourth Amendment interpretation. FBI Agents executed an arrest warrant for mail fraud in the living room of an apartment. As an incident of that arrest, the agents fanned out over the four-room apartment and conducted a painstaking five-hour search for two cancelled checks. They recovered from a bedroom bureau drawer a sealed envelope marked "George Harris, personal papers." They tore open the envelope and inside a smaller envelope recovered a number of Selective Service documents in no way related to the crime for which the arrest had been made. *Agnello* and *Marron* were cited as authority for the proposition that a "search incident" may extend to the entire premises wherein the arrest is made.[23] The "plain view" limitation placed upon *Marron's* broad scope by *Go-Bart* and *Lefkowitz* was ignored. Instead of candidly overruling *Go-Bart* and *Lefkowitz*, the Court reinterpreted them as condemning simply a general rummaging for evidence as opposed to a search directed toward specific objects. The inadvertent recovery of the Selective Service documents in the course of the search for the cancelled checks was held to be legitimate. Any consideration of "plain

---

21. *Lefkowitz*, p. 465.
22. The speciousness of this reinterpretation of *Marron* is pointed out in Way, "Increasing Scope of Search Incidental to Arrest," 1959 Wash. U.L.Q. 261, 268:
> "The Court ignored the reported fact in the *Marron* case that the ledger seized was not visible from the place of arrest but found upon search of the closet of the bathroom."

and in Landynski, "The Supreme Court's Search for Fourth Amendment Standards: The Warrantless Search," 45 Conn. Bar Journal 2, 7:
> "This statement nicely overlooked the fact that the ledger seized in the *Marron* case was taken from a closet and was evidently not visible from the place of arrest."

23. *Harris, supra*, at 151-152, and n. 16.

view" was superfluous under the "broad scope" approach of *Harris*.

Justices Frankfurter, Murphy, Rutledge and Jackson dissented in three separate opinions. Justice Murphy, in the course of a discussion of the scope of a "search incident", made reference to "plain sight" seizure, at 186:

> "Seizure may be made of articles and papers on the person of the one arrested. And the arresting officer is free to look around and seize those fruits and evidences of crime which are in plain sight and in his immediate and discernible presence."

As violent a swing as *Harris* represented in the one direction, it was followed a year later by a correspondingly violent swing in the opposite direction in *Trupiano v. United States, supra*.[24] Internal Revenue Agents arrested a violator in a barn which was then being used as an illicit distillery. The distilling equipment which was seized was not merely on the premises, but was 1) in "plain view" of the arresting officers and 2) in the immediate physical reach and control of the arrestee. The seizure would have been constitutional even under the more restrictive approach of the earlier *Go-Bart* and *Lefkowitz* decisions. In ruling it unconstitutional, however, the Court engrafted onto the search and seizure law a new requirement of "inadvertence." It held that all exceptions to the warrant requirement grew only out of necessity and that, therefore, those exceptions would not apply where there had been an opportunity for the agents to obtain a search warrant.[25] The majority did contor-

---

24. The only rational explanation for the 180° shift in constitutional philosophy between *Harris* and *Trupiano* is that Justice Douglas, who had been with Chief Justice Vinson and Justices Black, Reed and Burton to form the *Harris* majority, crossed the aisle to join the *Harris* dissenters of Justices Frankfurter, Jackson, Murphy and Rutledge to form the new "limited scope" majority in *Trupiano*.

25. Although *Trupiano* went into Limbo after *Rabinowitz*, it was in major measure reinstated by *Chimel*. Its "inadvertence" requirement resurfaced in *Coolidge* both as a necessary condition precedent for the "Plain View" Doctrine and as a factor in the exigency requirement for the "automobile exception."

tions to avoid having to overrule *Harris*. It reasoned that the finding of the Selective Service documents in *Harris* had been inadvertent, conveniently ignoring that the five-hour search for the cancelled checks (which led to the discovery of the Selective Service documents) had been the very antithesis of inadvertence.[26] It added, almost apologetically, at 709:

> "These factual differences may or may not be of significance so far as general principles are concerned. But the differences are enough to justify confining ourselves to the precise facts of this case, leaving it to another day to test the *Harris* situation by the rule that search warrants are to be obtained and used wherever reasonably practicable."

The dissent of Chief Justice Vinson, joined by Justices Black, Reed and Burton, twice referred to the distilling equipment as having been "in open view" and twice referred to it as having been "in plain sight." It articulated its rationale for the legitimacy of the seizure, at 714:

> "The validity of the search and seizure as incident to a lawful arrest has been based upon a recognition by this Court that where law-enforcement agents have lawfully gained entrance into premises and have executed a valid arrest of the occupant, the vital rights of privacy protected by the Fourth Amendment are not denied by seizure of contraband materials and instrumentalities of crime in open view or such as may be brought to light by a reasonable search."

The swing of the constitutional pendulum continued unabated in *United States v. Rabinowitz, supra*.[27] Gov-

---

26. Or as was said by Justice Murphy in dissent in *Harris*, at 193: "The key fact of this case is that the search was lawless. A lawless search cannot give rise to a lawful seizure . . ."

27. In the two-year interim, Justices Clark and Minton had replaced Justices Murphy and Rutledge.

ernment agents arrested the defendant at his place of business for forging and altering postage stamps. As an incident of that arrest, they searched his one-room office for an hour and one-half. They recovered inculpatory postage stamps from a desk, a safe and file cabinets. The search would clearly have been unconstitutional under *Trupiano*. In articulating a new "total atmosphere" standard for Fourth Amendment reasonableness, the Court overruled *Trupiano*. It held that the relevant test is "not whether it is reasonable to procure a search warrant, but whether the search was reasonable." The Court boldly reasserted the proposition that an entire premises under the control of a person arrested may be searched as an incident of the arrest. It cited as its authority *Agnello, Carroll* and *Weeks* as well as *Marron,* which it characterized as not having been "drained of contemporary vitality by *Go-Bart Importing Company v. United States* . . . and *United States v. Lefkowitz,*" and *Harris,* which it characterized as not having been "overruled." Although not central to its holding, the Court at one point carelessly referred to the desk, the safe and the file cabinets as being "within plain view," apparently not grasping that what significantly needs be "in plain view" is the thing to be seized, not the thing or place to be searched.[28]

If the birth of the "Plain View" Doctrine had to await *Coolidge,* its Annunciation came through Justice Frankfurter in his series of dissents in *Rabinowitz, Harris* and *Davis v. United States,* 328 U. S. 582 (1946). What had theretofore been at best inchoate was now formulated into a coherent rule.

Justice Frankfurter first cut the Gordian knot of alternating and intertwining citation of precedent by looking pre-*Weeks* to the original justifying rationale of a "search incident." He showed historically that it was

---

28. Two thoughtful criticisms of the *Harris-Rabinowitz* approach, noting particularly its lack of a "comprehensive rationale," are to be found in Note, "Scope Limitations for Searches Incident to Arrest," 78 Yale L. J. 433 (1969), and Note, "The Supreme Court, 1966 Term," 81 Harv. L. Rev. 69, 117-122 (1967).

necessary "first, in order to protect the arresting officer and to deprive the prisoner of potential means of escape . . . and, secondly, to avoid destruction of evidence by the arrested person." *Rabinowitz,* at 72. "From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control." *Rabinowitz,* at 72. "Immediate physical control" and "immediate physical surroundings" were defined as that "which may fairly be deemed to be an extension of his person." *Rabinowitz,* at 72-73.

Justice Frankfurter then demonstrated that the root of the present controversy lay in the "loose use of language"—the imposition of property law connotations onto such words as "possession" and "control" irrelevantly to the necessities of the Fourth Amendment—the use of language "not with fastidious precision." *Rabinowitz,* at 72. He reasoned in *Harris,* at 164:

> "For some purposes, to be sure, a man's house and its contents are deemed to be in his 'possession' or 'control' even when he is miles away. Because this is a mode of legal reasoning relevant to disputes over property, the usual phrase for such non-physical control is 'constructive possession.' But this mode of thought and these concepts are irrelevant to the application of the Fourth Amendment and hostile to respect for the liberties which it protects. Due regard for the policy of the Fourth Amendment precludes indulgence in the fiction that the recesses of a man's house are like the pockets of the clothes he wears at the time of his arrest."

Justice Frankfurter's statement of the necessity undergirding the common law right of "search incident" found voice in *Preston v. United States, supra,* at 367. His total formulation of a "search incident" rationale received the official imprimatur of the Court in *Chimel v. California, supra.* The majority opinion in *Chimel* reads like a re-

statement of the Frankfurter dissent in *Rabinowitz*, to which *Chimel* gives full credit. *Chimel* recognized the necessities which gave rise to the law of "search incident" and recognized further that the "scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U. S. 1, 19.

Having thus constricted the search perimeter from an arrestee's total premises (that which is under his proprietary control) to the area within the arrestee's reach or grasp (that which is under his physical control), Justice Frankfurter then proceeded to fill the interstice. He provided the conceptual *sine qua non* for the later "Plain View" Doctrine by pointing out that, "It is important to keep clear the distinction between prohibited searches on the one hand and improper seizures on the other." [29] He reasoned in *Davis*, at 612:

> "Another factor enters. This language is sometimes used in cases involving the seizure of items properly subject to seizure because in open view at the time of arrest. But this last confusion is due to a failure to distinguish between the appropriate scope of a search on arrest and the very different problem as to the right of seizure where no search is in question."

Justice Frankfurter demonstrated that the Court's doctrinal confusion had been caused in large measure by its own bipolarity between a "limited scope" view and a "broad scope" view of "search incident" law—not recognizing the middle ground of "broad seizure" not tied to a "broad search." He cut the seizure rationale loose from the search rationale. He reasoned in *Rabinowitz*, at 75:

> "This progressive distortion is due to an uncritical confusion of (1) the right to search the per-

---

29. An excellent analytical discussion of seizure as a problem distinct from that of search is found in *People v. Curley*, 12 Cal. App. 3d 732, 738-748.

son arrested and articles in his immediate physical control and (2) the right to seize visible instruments or fruits of crime at the scene of the arrest with (3) an alleged right to search the place of arrest. It is necessary in this connection to distinguish clearly between prohibited searches and improper seizures. It is unconstitutional to make an improper search even for articles that are appropriately subject to seizure when found by legal means. . . . Thus, the seizure of items properly subject to seizure because in open view at the time of arrest does not carry with it the right to search for such items."

The intellectual spadework had been done for the "Plain View" Doctrine. A "Plain View" seizure was not a search. The seizure perimeter was broader than the search perimeter.

Before the official birth of the Doctrine in *Coolidge,* however, a dimension was to be added. Until 1967, "plain view" had been discussed or alluded to exclusively within the framework of "search incident" law. Beginning in 1967, two cases arguably suggested and one squarely held that the notion of "plain view" had a utility even beyond the confines of "search incident" situations.

In *Warden v. Hayden, supra,* policemen were in "hot pursuit" of an armed and fleeing holdup man. They followed into the house which he was seen to enter. It turned out to be his own. They fanned out over all three floors. Hayden was arrested in an upstairs bedroom, feigning sleep. Meanwhile, an officer searching the cellar turned up an inculpatory jacket and a pair of trousers in a washing machine. The Supreme Court held that the warrantless entry of Hayden's house to search for him and the warrantless search of Hayden himself were valid since "the exigencies of the situation made that course imperative." In recognizing for the first time, in a square holding, the "exigent circumstances" exception to the warrant requirement, the Court said, at 298-299:

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."

In legitimating the basement search, the Court eschewed reliance on a "search incident" theory, since "the seizures occurred prior to or immediately contemporary with Hayden's arrest." Independent of any "search incident" theory, the Court held that the basement search for the fugitive, for possible confederates and/or for weapons was an integral part of the "exigent circumstances" exception, reasoning that that search was "part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape," at p. 299. The Court further reasoned that when the search of the washing machine for weapons turned up the inculpatory clothing, the seizure thereof was constitutional. Although the Court's opinion made no mention of "plain view," *Coolidge* later read this case to be one involving "plain view." [30]

---

**30.** Although *Coolidge* warned that, "it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure," it may not have heeded its own admonition when it cited *Hayden* as an illustrative example of the "Plain View" Doctrine. It would appear that *Hayden* was not literally a "Plain View" case, but rather a closely analogous one in which a valid search for one item inadvertently turns up a validly seizable different item. Even if it is not a pure example, however, the reasoning of *Hayden* is nonetheless apposite for the "Plain View" Doctrine. A cleaner illustration might be where a searching officer, under the circumstances present in *Hayden*, discovered and seized other evidence not from a washing machine but literally out in "plain view." The results, of course, in terms of seizability, would not be dissimilar.

Within the year, *Harris v. United States*, 390 U. S. 234 (1968), invoked "Plain View" in explicit terms. The defendant's automobile had been seen leaving the scene of a robbery. The car was traced and the defendant was arrested as he was entering it, near his home. He was taken to the police station. The car was impounded as evidence and towed to the station. When it arrived at the station, its windows were open and its doors were unlocked. It had begun to rain. A departmental regulation required the police to search an impounded vehicle thoroughly, to remove all valuables from it, and to attach to the vehicle a property tag listing certain information about the circumstances of the impounding. Pursuant to this regulation, an officer searched the car and placed a property tag on it. He then proceeded to roll up the windows and to lock the doors. As he opened the front door on the passenger side in order to roll up the window, the officer saw an inculpatory registration card. The warrantless seizure was held to be constitutional.

The Supreme Court held that the discovery of the card was not the result of an investigative search but rather of a legitimate measure taken to protect the car while it was in police custody. It held, at 236:

> "Once the door had lawfully been opened, the registration card, with the name of the robbery victim on it, was plainly visible. It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." [31]

31. One could quarrel not with the conclusion of *Harris* in this regard but only with its easy assurance that the point of law it stands for "has long been settled." Its citation of *Ker v. California, supra; United States v. Lee*, 274 U. S. 559; and *Hester v. United States*, 265 U. S. 57, seems scant authority for its general proposition. *Ker* was a seizure purely within a "search incident" context, relying in turn for its validity upon *Harris v. United States*, 331 U. S. 145 (and commanding the support of only four members of the Court on this point). *Hester* simply held that the Fourth Amendment does not extend its protection "to the open fields," and that abandoned property was properly seizable therefrom. *United States v. Lee* dealt not with a post-intrusion visual observation but rather

The last of the intimations was *Frazier v. Cupp*, 394 U. S. 731 (1969). One co-defendant gave the police permission to search the duffel bag shared by him and Frazier for incriminating evidence. The consensual search was aimed at this co-defendant. In the course of the search, the police came across certain clothing of Frazier's, which was seized. Citing *Harris v. United States*, 390 U. S., and *Warden v. Hayden, supra*, as its authority, the Court said, at 740:

> "The officers therefore found evidence against petitioner while in the course of an otherwise lawful search. Under this Court's past decisions, they were clearly permitted to seize it." [32]

The utility of the "Plain View" concept having thus outgrown its "search incident" origins, a broader formulation of its rule was called for. This was to be the office of *Coolidge*.

### The "Plain View" Doctrine Today
### The Prior Valid Intrusion Requirement

In articulating the "Plain View" Doctrine, *Coolidge* recognized at the outset that the use of "plain view" as a descriptive phrase is not coterminous with its use as a legal concept, at 465:

> "It is well established that under certain cir-

---

with a pre-intrusion observation made from a Coast Guard cutter onto the deck of a motorboat. That observation did not furnish the direct justification for the subsequent seizure of contraband whiskey but only supplied probable cause. That probable cause was the predicate for 1) an arrest which then led to the seizure of the whiskey as an incident of the arrest and 2) the seizure of the whiskey, notwithstanding arrest, on the basis of the Federal statute authorizing such seizure on the high seas where probable cause is present. Although the result reached in this *Harris* case is sound, its marshalling of history is far more tenuous.

32. As in *Warden v. Hayden*, this appears to be not literally a "Plain View" case, but rather the closely analogous situation in which a valid search for one item inadvertently turns up a validly seizable different item. The reasoning that a legitimate search for one item may serve as the valid predicate for the seizure of another item—whether that other item is simply turned up in the course of the search or is literally in "plain view"—is apposite for the "Plain View" Doctrine, nevertheless.

cumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal."

It pointed out that the first condition precedent to a "Plain View" seizure is a justifiable prior intrusion. Although not purporting to exhaust the category, it listed four situations illustrating a prior valid intrusion:

1. A "search incident" to a valid arrest inside a "constitutionally protected area" that is "appropriately limited in scope." [33] In giving voice to the Frankfurter rationale, *Coolidge* stated, "The 'plain view' doctrine would normally justify as well the seizure of other evidence that came to light during such an appropriately limited search. . . . Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee." *Coolidge,* 465, n. 24.

2. The "exigent circumstances" which justify a warrantless entry into a "constitutionally protected area," such as "hot pursuit." [34]

3. The valid presence inside a "constitutionally protected area" for some legitimate purpose other than the search for evidence against the accused.[35]

---

**33.** Citing *Chimel* as authority.
**34.** Citing *Warden v. Hayden* as authority.
**35.** Citing *Harris,* 390 U. S., and *Frazier v. Cupp.* Also citing

4. The warranted search of a "given area for specified objects . . . in the course of [which] . . . [the searchers] come across some other article of incriminating character." [36]

*Coolidge* points out that the common denominator of all these situations is that there has been a prior valid intrusion. The "Plain View" Doctrine then supplements that valid intrusion by extending the seizure perimeter to those things which are in "Plain View" from that legitimate vantage point. It explains, at 466:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure."

In enunciating the rationale for the "Plain View" excep-

---

*Ker v. California,* in which evidence observed in "plain view" during a "search incident" of one defendant was seized and used against a second defendant. Also referring, by way of "cf.", to *Lewis v. United States,* 385 U. S. 206, wherein an undercover agent's presence by invitation in the home of an unsuspecting suspect was held to be legitimate. See also *Neam v. State,* 14 Md. App. 180, 184-185.

36. No directly supporting authority is offered but several cases are cited as lending support by analogy. *Go-Bart* and *Lefkowitz*—both of which were "search incident" cases—deal with "plain view" only obliquely by way of characterizing *Marron* in order to distinguish it. Also cited is *Steele v. United States,* 267 U. S. 498, where the only goods seized were, in fact, described in the warrant. The most direct support for the proposition in dicta in the concurring opinion of Justice Stewart in *Stanley v. Georgia,* 394 U. S. 557. (The majority decided *Stanley v. Georgia* on other, First Amendment, grounds.) But see *Marron v. United States, supra; Davis v. United States, supra* (dissenting opinion by Frankfurter, J.); *Zap v. United States,* 328 U. S. 624 (1946) (dissenting opinion by Frankfurter, J.); Lasson, *op. cit.* 127; and Landynski, *Search and Seizure and the Supreme Court,* 116.

tion, *Coolidge* sets out "the two distinct constitutional protections served by the warrant requirement." It protects against *"any* intrusion in the way of search or seizure" which is not justified by "a careful prior determination of necessity." It then mandates that even "those searches deemed necessary should be as limited as possible." It reasons that the "Plain View" exception is not in conflict with the first objective because the plain view does not occur until after the valid intrusion has already been made and its purpose is already in progress. It then reasons that the plain view exception is consistent with the second objective "since it does not convert the search into a general or exploratory one."

It becomes apparent that the "Plain View" Doctrine comprehends only one variety of the ocular "plain view's." It does not contemplate the non-intrusion visual observation, such as where evidence is in "open view" and therefore seizable in a "constitutionally non-protected area." See *Hester v. United States, supra,* wherein evidence was seen and was validly seized in an "open field," notwithstanding police trespass upon the field. Nor does the "Plain View" Doctrine contemplate the pre-intrusion visual observation of evidence in "open view" inside a "constitutionally protected area," such as a house, garage, automobile, etc., from a vantage point outside the "constitutionally protected area." Here the valid visual observation simply furnishes probable cause for 1) the issuance of a warrant, *Steele v. United States,* 267 U. S. 498 (1925); or 2) the warrantless entry of a vehicle or vessel, provided exigent circumstances are also present, *United States v. Lee, supra; Scales v. State,* 13 Md. App. 474; or 3) the warrantless entry to effect an arrest for a crime being committed in the officer's presence, *Agnello,* at 30; *Griffin v. State,* 200 Md. 569. As a non-search, the visual observation itself is legitimate; but it may never, standing alone, justify an intrusion. *Taylor v. United States,* 286 U. S. 1 (1932). Thus, the formal "Plain View" Doctrine, as announced in *Coolidge,* is exclusively a post-intrusion phenomenon.

The chameleon-like quality of the phrase "plain view" stems from its loose employment to describe these visually similar but legally distinct situations. Although they share the common denominator of a non-searching, sighting of evidence in "open view," the non-intrusion observation needs no further justification for a seizure; the pre-intrusion observation does need some additional legal predicate for the intrusion necessary to effect the seizure; [37] and the post-intrusion—or truly "Plain View"— observation has already validly surmounted the intrusion hurdle. It was the inadequacy of the vocabulary to keep separate these very different legal problems whereof we spoke in *Scales v. State, supra,* at 478, n. 1:

> "In this context, we studiously avoid the phraseology 'in plain view' to avoid any implication that the so-called 'plain view doctrine' is being invoked. That doctrine is not here applicable. Needless confusion is frequently engendered by the employment in many opinions of the same phrase—'in plain view'—to describe two visually similar but legally distinct situations. The 'plain view doctrine,' as described in *Coolidge v. New Hampshire,* 29 L.Ed.2d 564, refers exclusively to the legal justification—the reasonableness—for the seizure of evidence which has not

37. In *Scales v. State, supra,* we expressly recognized the two-step process between the sighting of evidence in "open view" inside an automobile and the subsequent intrusion made to effect a seizure of that evidence. In our other cases involving the sighting of evidence in "open view" inside of an automobile, we have, at least implicitly, also recognized the two-step process. The visual observation serves initially to establish probable cause. The mobility of the automobile then provides the additional legal predicate—the exigent circumstance—necessary to make the warrantless intrusion and seizure under the *Carroll* doctrine. The "open view" was merely the first step and would not have been enough, absent the exigent circumstance, to justify the intrusion. *Roop v. State,* 13 Md. App. 251, 259-260; *Taylor v. State,* 9 Md. App. 402, 406-407; *Johnson v. State,* 8 Md. App. 28; *Sweeting v. State,* 5 Md. App. 623. See also Kuipers, "Suspicious Objects, Probable Cause, and the Law of Search and Seizure," 21 Drake L. Rev. 252, 266: "Very frequently a constitutionally seizable object is observed in plain view within a motor vehicle. Once probable cause is shown, immediate warrantless seizure of the item is usually permissible, since exigent circumstances in the form of mobility are almost always present."

been particularly described in a warrant and which is inadvertently spotted in the course of a constitutional search already in progress or in the course of an otherwise justifiable intrusion into a constitutionally protected area. It has no applicability when the vantage point from which the 'plain view' is made is not within a constitutionally protected area. It is, therefore, literarily discreet to use for such latter situations some alternative phraseology such as 'clearly visible,' 'readily observable,' 'open to public gaze,' etc., rather than to employ the words 'in plain view' in their purely descriptive capacity, lest the unwary reader read them in their other and talismanic capacity as an invocation of the doctrine of the same name in non-intrusive situations where it is not applicable."

## The Inadvertence Requirement

The second condition precedent to the invocation of the "Plain View" Doctrine is that the "Plain View" discovery be inadvertent. This requirement is a direct legacy of *Trupiano*.[38] It is stated simply in *Coolidge,* at 469-471:

"The second limitation is that the discovery of evidence in plain view must be inadvertent. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a 'general' one, while the inconvenience of procuring a warrant

---

38. In Part II-D of *Coolidge,* Justice Stewart acknowledges that, "Our discussion of 'plain view' in Part C above corresponds with that given in *Trupiano*. Here, as in *Trupiano,* the determining factors are advance police knowledge of the existence and location of the evidence, police intention to seize it, and the ample opportunity for obtaining a warrant." He points out, however, that *Trupiano* is not reinstated, *in toto,* since the inadvertence requirement implicit in *Trupiano* for any search and any seizure is not being imposed on the "search incident" of an arrestee and his immediate physical surroundings nor is it necessarily being imposed upon the "automobile exception" where exigent circumstances may otherwise be present. *Coolidge,* 482.

to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.' " [39]

The evil at which this requirement is aimed is the "planned warrantless seizure." The "Inadvertence" re-

---

39. The "Prior Valid Intrusion" requirement for the invocation of the "Plain View" Doctrine provoked no criticism from the dissenting justices. It was rather the "Inadvertence" requirement to which they took great umbrage. See the dissenting opinions of Justice Black, at pp. 505-510, and of Justice White, at pp. 513-522. Also highly critical of the "Inadvertence" requirement is LaFave, op. cit., pp. 29-30. The perplexing question of how inadvertent is "inadvertent"? is raised in Note, "The Supreme Court, 1970 Term," 85 Harv. L. Rev. 3, 244-246:

> "The most serious problem with the plurality's approach to plain view is that Justice Stewart nowhere defined the degree of expectation required to make a discovery by the police inadvertent. If the rule is taken to mean that a plain-view discovery will be held invalid, because *not* inadvertent, only when the police have probable cause to believe that the evidence would be found, it will be of limited effect. . . .
> The inadvertence rule will be far more significant if it is interpreted as requiring the invalidation of discoveries when the police have an expectation that evidence will be discovered on the premises but lack probable cause to search. . . .
> . . . In most cases it would be difficult, if not impossible, for police in this situation to prove that they had no expectation of discovering evidence; whenever there is sufficient probable cause to arrest, there is usually at least a suspicion that some relevant evidence may be found in the open at the suspect's home. It is unlikely the plurality intended its inadvertence rule to penalize police who acted without the ulterior purpose of gaining a view of premises, even if they did have some slight suspicion that evidence might be found."

As the Note makes clear, the most probable interpretation for "inadvertent" will be that which simply prevents a *planned* warrantless seizure: "For evidence in plain view, the likeliest alternative is a narrow interpretation of the inadvertence rule, applying it only where it is clear that the police had probable cause to obtain a search warrant." Id., p. 250.

quirement is intended to prevent the police from using an entry into a "constitutionally protected area" for purposes of making an arrest—or for any other ostensibly legitimate purpose—as a mere subterfuge for a "Plain View" reconnoitering. There may not be a contrived investigatory reconnaissance aimed at evading the warrant requirement for a search or seizure. There may not be a planned "Plain View."

### The Present Case

The appellant's key contention is that a warrantless seizure of inculpatory evidence violated his rights under the Fourth Amendment and that the trial judge committed prejudicial error when he failed to exclude that evidence from the trial. The State seeks to invoke the "Plain View" Doctrine to justify the seizure. We hold that under that doctrine, the seizure here fails to pass constitutional muster.

During the early morning hours of March 4, 1970, a breaking and entering occurred at Parker's, Inc., a business establishment in Hurlock, Dorchester County, Maryland. Merchandise worth $194.09 was stolen—including a red toolbox, a quantity of flashlight batteries and a number of muffler clamps. The investigative trail led nowhere. Five months later, however, on August 13, 1970, a second breaking and entering occurred at the same establishment, with the same *modus operandi* having been employed. On this second occasion, a quantity of Safemark tires were stolen, a brand available only to Farm Bureau members. Local police departments, gasoline stations and garages were alerted to be on the lookout for Safemark tires, particularly where the possessors did not appear to be Farm Bureau members. One month later, on September 27, 1970, two Puerto Rican migrant laborers, then working at a labor camp in Bridgeville, Delaware, were involved in a motor vehicle accident in the town of Federalsburg, Caroline County, Maryland. Two Safemark tires were discovered in the trunk of their automobile. It developed that the tires

had come from the August 13 breaking and entering at Parker's, Inc.[40] The version of their acquisition of the tires given by the two Puerto Ricans then led to the ostensible seller of those tires—the appellant, who was living and working in Bridgeville, Delaware.

A three-man investigating team consisting of a Maryland State trooper, a Delaware State trooper and a Deputy Sheriff for Dorchester County, confronted the appellant on the street in Bridgeville, informed him that they wished to question him about the two Safemark tires and proceeded to give him the full recital of his rights under *Miranda*. The appellant initially claimed to have received the tires from two unnamed migrant workers from Florida. After a trip to several labor camps in the Bridgeville area failed to produce the two migrants, the appellant was arrested for receiving stolen goods and was transported to the Delaware State Police Barracks at Bridgeville.

The Maryland State trooper there requested the permission of the appellant to search his residence. The appellant refused. The trooper advised the appellant that, if necessary, a search warrant could be obtained. The appellant still refused. The three investigators then proceeded, while the appellant was still in custody, to the home of Mrs. Mamie Hall, 109 First Street, in Bridgeville. The appellant there rented a room from Mrs. Hall. The Deputy Sheriff, testifying that it was the intention of the three investigators to obtain a search warrant, explained that the purpose for the trip to Mrs. Hall's home was to obtain a description of the house for the drafting of the warrant and to confirm the fact that the appellant did reside there.

The three investigators approached the side door. After identifying themselves, they were cordially invited into the house by Mrs. Hall, "Won't you please come in— watch your step." Inviting them to come into the front room, Mrs. Hall had to lead them along a narrow hall-

---

40. The two Puerto Ricans were subsequently convicted in Caroline County of receiving stolen goods.

way. The appellant's rented room was located just off that hallway. Its door was open. In passing, Mrs. Hall stated, "There's the room where Willie lives."

From the hallway, the Deputy Sheriff looked into the room and saw a cardboard box, unremarkable in itself. The box was sitting on the floor approximately two feet inside the room. The Deputy Sheriff testified that he could see, "in plain view," "the heavy-duty clamps, pipe clamps, and the batteries, which resembled the description of those which were stolen from Parker's, being the same make." Still from the hallway, he directed the attention of the other two investigators to the box. Without walking into the room, the Deputy Sheriff reached down and seized the box and its contents. The contents were, indeed, the stolen goods from Parker's and they were received in evidence, over his objection, at the appellant's trial.

In overruling the appellant's motion to suppress the evidence, the trial judge misconceived, we feel, the full implications of the "Plain View" Doctrine:

"THE COURT: I am familiar with what you are saying, but what about the fact that the testimony is all to the effect that this was in plain view from the hall. There was no search.

MR. SADOFF: But there was seizure.

THE COURT: But, no search. Something that was in plain view. In otherwords, the box was in plain view of the officers, and the officers were in a place that they had a right to be. It is similar, is it not, to the case where the officer walks down the street and sees something in an automobile.

MR. SADOFF: I agree on that.

THE COURT: That is the way it appears to me, without getting into the question of consent, because they had already seen it. I understand what your argument is, and I think it is well taken. I do not think the landlady can authorize a complete search of your room or of this

> Defendant's room, I don't think she can do that. If his room was closed, his door was closed, I don't think the landlady could authorize the police to open that door and go in and search and seize. But here, I am linking this to an officer on the street who observed something in an automobile. It is in plain view."

There is no question but that Mrs. Hall could consent and did consent to the presence of the three investigators in her house. As they were standing in her hallway, they were unquestionably in a place where they had a right to be. From that legitimate vantage point, they were entitled to see whatever could be seen. *Steele v. United States, supra; United States v. Lee, supra; Taylor v. United States, supra; Ferguson v. State,* 236 Md. 148; *Griffin v. State, supra; Minnick v. State,* 4 Md. App. 81; *Johnson v. State,* 2 Md. App. 300; *Mullaney v. State,* 5 Md. App. 248. Simply seeing evidence in "open view" from a legitimate vantage point, however, is not dispositive of the question of ultimate seizability, as the "Plain View" Doctrine clearly establishes.

For purposes of this appellant's Fourth Amendment rights, his "constitutionally protected area"—the legitimate boundaries of his "expectation of privacy"—was the room he rented and not the entire house. The landlady could countenance a prior valid intrusion of police investigators into the house at large, but not into his room. *Stoner v. California,* 376 U. S. 483 (1964); *United States v. Jeffers,* 342 U. S. 48 (1951); *Lustig v. United States,* 338 U. S. 74 (1949); *McDonald v. United States,* 335 U. S. 451 (1948); *Chapman v. United States,* 365 U. S. 610 (1961). The threshold, therefore, that concerns us here—in measuring whether there was or was not a prior valid intrusion—is the threshold to the appellant's room, not the threshold to Mrs. Hall's house. In this case, the relevant threshold had not been crossed, and without a warrant it could not be crossed. The police were on the outside, looking in. There being no prior

valid intrusion, the "Plain View" Doctrine is simply inapplicable.

Notwithstanding the lack of a "Plain View", what legal consequences flowed from the legitimate "open view"? We will assume that that "open view" furnished the police ample probable cause to believe that the items openly viewed were stolen goods. *Coolidge* points out, at 468:

> ". . . plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' "

The analogy to automobile cases, relied on by the trial court here, is not a valid analogy. The so-called "automobile exception" to the warrant requirement does not extend to fixed premises. Even under the "automobile exception," an "open view" is never enough, standing alone. It simply furnishes the probable cause. There must always then be an additional factor—the exigent circumstance—present to permit the warrantless entry. *United States v. Lee, supra.* In *Scales,* we were careful to point out the two-step process, at 477-478:

> "When Detective Daniels was standing on the parking lot next to the appellant's vehicle, he was in a place where he and every other member of the public had a right to be. When Detective Daniels looked through the window into the interior of the car and directed his flashlight so as to facilitate that look, he was doing that which he and every member of the public had a right to do. As a result of that look, he saw, protruding from underneath the seat, a tire iron within clear visibility. At that point, there had been no intrusion, within the contemplation of the Fourth Amendment, into any constitutionally protected area. It is from that point

that we measure the reasonableness of the ensuing search.

We feel that the search in this case was constitutionally proper under the so-called 'automobile exception' to the basic constitutional rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' "

With respect to fixed premises, no amount of probable cause will justify an intrusion. This is the undisputed teaching of *Agnello, supra; Taylor v. United States, supra; Johnson v. United States,* 333 U. S. 10 (1948), and *Jones v. United States,* 357 U. S. 493 (1958). As Coolidge said, at 468:

"Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure."

The more valid analogy to the instant case would be the combination of *Steele v. United States, supra,* and *Taylor v. United States, supra.* In *Steele,* police agents, conducting a discreet surveillance from a place where they had the right to be, looked into the interior of a garage and saw contraband whiskey in "open view" through an open doorway. This did not, *ipso facto,* justify an immediate entry and seizure. It rather furnished the probable cause for a warrant which was issued and executed. Conversely, in *Taylor,* police agents, again standing where they had a right to be, looked through a small opening into a garage and saw contraband in "open view." They immediately entered and executed a war-

rantless seizure of the contraband. The seizure was held to be unconstitutional. See also *Pendleton v. Nelson,* 404 F. 2d 1074 (9th Cir. 1968); *United States v. Sokolow,* 450 F. 2d 324 (5th Cir. 1971).

The evidence should have been suppressed as unconstitionally seized.

In view of our disposition of the case on Fourth Amendment grounds, it is unnecessary to reach the other two contentions raised by the appellant. We note in brief, however, that there is no constitutional right to a preliminary hearing. *Gerstein v. State,* 10 Md. App. 322; *Billings v. State,* 10 Md. App. 31; *State v. Simms,* 13 Md. App. 203; *Dunphy v. State,* 13 Md. App. 671.

*Judgments reversed; case remanded for a new trial.*