FRANKLIN EUGENE WITCHER *v.* STATE OF MARYLAND

[No. 316, September Term, 1972.]

*Decided April 6, 1973.*

The cause was submitted on briefs to THOMPSON, MOYLAN and DAVIDSON, JJ.

Submitted by *Robert J. Dougherty* for appellant.

Submitted by *Francis B. Burch, Attorney General, James G. Klair, Assistant Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Gary Bass* and *Gerald Richman, Assistant State's Attorneys for Baltimore City,* for appellee.

THOMPSON, J., delivered the opinion of the Court.

Franklin Eugene Witcher, the appellant, was convicted of murder in the first degree and of two charges of

armed robbery, by a jury in the Criminal Court of Baltimore, Judge James W. Murphy presiding. A sentence of life imprisonment was imposed for the murder conviction, and two twenty year consecutive terms, concurrent to each other, were imposed for the armed robbery convictions.

# I

Witcher's only significant contention on appeal is that he was denied due process of law by reason of impermissibly suggestive in-court identifications. Prior to trial Witcher moved that the anticipated in-court identifications of the eyewitnesses be suppressed; at the hearing on the motion the morning of the trial the evidence offered in support thereof consisted of counsel's pointing out that Witcher was the only black male in the courtroom and Witcher's testimony that none of the eyewitnesses to the crime had confronted him at his preliminary hearing and that no lineup was ever held. The trial court pointed out that he had granted Witcher's motion to exclude the eyewitnesses from the courtroom prior to his being brought in; and that while he would permit the accused to sit in the public area of the courtroom, he would not assume any responsibility for the procurement of other young black males to be present. The judge ruled that Witcher had failed to make a showing sufficient to suppress the in-court identification but he permitted counsel an opportunity to go through the courthouse to see if he could procure other negro males to sit in the audience. When the case was called for trial, counsel stated he had been unable to get volunteers and asked the court to intervene. The court denied his request.

At the trial three eyewitnesses and an accomplice identified the accused. Counsel objected when each of the eyewitnesses was called upon to point out the criminal. At the time of each objection, the trial court had no more information on the issue of pre-trial identifica-

tion procedures than he had had at the pre-trial hearing on the motion to suppress. It developed on the cross-examination of the witnesses that one of them had failed to pick Witcher's photograph from among a group of five and that from a lineup in which appellant did not participate, had picked another person as one who resembled the criminal agent; a second witness identified no one from a group of photographs shown him; and a third witness had identified from the group of five the photograph of Witcher as "looking like" the criminal agent.

There was no objection to the accomplice's testimony as to identification.

Witcher filed a motion for a new trial and alleged that he had been denied due process of law by reason of the suggestive in-court identifications. He argued in support of his motion that two of the witnesses had failed to select his photograph from several shown them. The trial court ruled that nothing was presented which would have required a suppression of the in-court identifications. We affirm the judgment for the reason that under the totality of the circumstances, the identification was reliable even though the in-court confrontation procedure was suggestive. *Neil v. Biggers,* 93 S. Ct. 375, 383, 409 U. S. 188, 34 L.Ed.2d 401 (1972).

In the early afternoon of September 30, 1971, Lewis Gilbert Rubin, part owner of the Blue Musical Bar, a tavern on Saratoga Street in Baltimore, was seated behind the bar when two young men entered the tavern armed with pistols. Shortly after their entrance, one of the men shot and fatally wounded Mr. Rubin. One of the assailants forced the barmaid, Shirley Townes, to allow him access to the currency in a register. Besides Mrs. Townes, two other witnesses to the crimes, Lorraine Mealey and Howard Medley, testified at the trial.

Shirley Townes testified she heard a noise and "when I looked up I saw this fire from the gun and Lewis grabbed his chest. And he looked at me and then he

toppled over." The decedent's assailant jumped over the bar and announced the holdup. Asked whether she saw this person in the courtroom, Mrs. Townes answered, over objection, "Yes, I do I think. . . . Very close," indicating the appellant, Witcher. When asked what clothes he wore, she stated that she was primarily looking at the gun but that he was wearing a hat of the same type as State's Exhibit No. 2, mentioned hereinafter, that he had on blue dungarees and a striped shirt with dark blue stripes and white background. She could not observe his hair because the hat was pulled over his ears.

On cross-examination she testified she had been shown a series of five or six photographs which included that of the defendant but had been unable to make an identification. She had viewed a lineup which did not include the defendant but pointed out another man as "very close as far as features and resemblance are concerned." She testified that the bar was very well lit when the incident occurred and that she had seen the accused neither before nor since the crime. On re-direct examination, she stated that her attention was drawn to the accused when she entered the courtroom "because instantly when I looked at him, I remembered."

Howard Medley testified he was sitting in the bar reading a newspaper when someone came in and shot the decedent. When asked if he saw the person in court who did the shooting, he replied, "This fellow, [indicating Witcher] here looks very close to him." He stated that Witcher was in the bar for less than five minutes and that he was wearing a blue and white striped shirt with dark trousers, either khakis or overalls, that he was wearing a hat similar to State's Exhibit No. 2, either dark blue or black. He could not see the assailant's hair as he was wearing a hat "similar to a sailor's cap with the rim turned down." He said he never viewed a lineup but that he had looked at some pictures and that he told the police he thought the robber was between 17 and 20 years of age. Medley was unable to pick out the

accused from the photographs which had been shown to him about a week after the crime. When shown a picture of the defendant, Defendant's Exhibit No. 2, he stated that he had not seen that picture before, "I don't think" but that he saw the resemblance now to the accused. Asked why he was sure his in-court identification was accurate, Medley said, "Well, you see a man being killed in front of you and this sort of makes an impression in your mind and if you see this person again, more than likely you will remember this person."

Lorraine Mealey testified that while a customer in the Blue Musical Bar on the afternoon in question, "Two men came in and shot Mr. Lewis Rubin." When asked whether she saw either of the boys in the courtroom she replied that Witcher "looks like him." She described the assailant as wearing a blue and white striped shirt and dark blue dungarees and a cap, "something like the one I am looking at now." (State's Exhibit No. 2). The robber was in her sight for about 15 minutes, in an area which was well lighted. On cross-examination she stated one item of the description she had given to the police officers was that the robber was about 22 or 23 years old. At trial she estimated Witcher's present age at 22. Shortly after the crimes had been committed the police had shown her several photographs and that she had picked out Witcher's as looking "like the one that did the shooting." She was never asked to view a lineup and she had not seen the accused from the date of the crime until she observed him when she came into the courtroom.

Edward Williams testified that he had known Witcher for three or four years and that he stood outside the Blue Musical Bar while his cousin, Melvin Jordan, and Witcher entered for the purpose of robbing it. He had declined to enter the bar and told his companions that they need not give him any proceeds of the robbery. Williams testified that about 40 seconds after his companions entered the bar, he heard a shot and immedi-

ately ran from the area. He later met Witcher and Jordan and stated that Witcher "said when he was sticking the Blue Bar up, he said he thought the man was going for a pistol, he thought he shot him in the shoulder." Willliams accepted $15 of the total proceeds of the robbery which amounted to $150 or $160. The remainder was divided between Witcher and Jordan. When asked to describe the clothes Witcher was wearing on the day of the robbery, the following occurred:

> "A. I think he had on a pair of blue pants and a brown and white shirt.
> Q. Now, why do you remember that he had blue pants on and a brown and white shirt?
> A. Because they had a pair of blue wranglers on.
> * * *
> Q. What is that, like a blue jean?
> A. Yes.
> * * *
> Q. Blue wranglers and a brown and white shirt?
> A. Yes, flowered shirt.
> Q. Flowered shirt?
> A. Yes, I think it was flower.
> * * *
> Q. Are you certain of that?
> A. It was a blue pair of pants. I know one of them had on a pair of blue ones on, and one had on a pair of black pants. Both were wranglers, and I ain't too sure which one had which."

Detective William Jordan testified for the defense, stating that he had shown five photographs to Shirley Townes and that she did not make an identification although one of the photographs was of Franklin Eugene Witcher. Lorraine Mealey was shown the same series and picked out Witcher's photograph. The series of photographs was introduced into evidence as Defendant's Exhibit No. 4. He testified further that Mrs. Townes had

viewed a lineup and tentatively, but not positively, identified one individual. The lineup picture was introduced into evidence as Defendant's Exhibit No. 5. The detective further testified that Howard Medley was shown photographs but not the same series shown Townes and Mealey. The witness could not at trial identify the photographs as those exhibited to Medley because they might have been mixed up after he left the homicide division. He testified that when he arrested Witcher in his bedroom, the hat previously introduced into evidence as State's Exhibit No. 2 was found on the headboard of the bed. A photograph of Witcher taken at the Baltimore City Jail two weeks after the crime was introduced into evidence as Defendant's Exhibit No. 6.

Appellant's mother testified that she and appellant took her infant son to a clinic at University Hospital on the day of the crime. She testified that the three of them arrived at the hospital at 8:45 a.m. and did not return home until 12:30 or 1:00 p.m. The University Hospital record was introduced showing that appellant's infant brother was treated on September 30, 1971. It should be noted that although the various eyewitnesses varied somewhat as to the time of the crime, the medical examiner pronounced Lewis Rubin dead at 1:25 p.m., September 30, 1971.

The defendant testified on his own behalf that he and his mother took his infant brother to the University of Maryland Hospital on September 30, 1971. He admitted knowing Melvin Jordan all of his life and that he had known the witness, Williams, for about a month prior to the crime. He testified that Williams and he were not on good terms and he denied being in the company of Jordan or Williams on the day of the crime. He disavowed any knowledge of the crimes.

The State argues that appellant was afforded due process of law. We agree with its conclusion but for reasons different than those advanced in its brief.

As noted above, the state was aware that at least one and probably two of the witnesses had failed to select

the appellant's photograph when they could have been expected to do so and that at least one person, other than the accused, had been pointed out at a lineup as looking like the criminal. In *Coleman v. State,* 8 Md. App. 65, 258 A. 2d 42, where an accused appeared at a preliminary hearing at which he was identified by the hearing judge as the accused, where a witness for the first time positively identified the appellant as the criminal and the police officers knew that the witness had been unable to identify the accused on previous occasions, we held the proceedings even though official, deprived the accused of due process of law. Likewise, an official appearance in court for trial will not insulate the procedure from successful attack. Obviously such a confrontation can be as suggestive as an out of court showup or a confrontation at a preliminary hearing. It would require blind adherence to no longer viable precedent to hold otherwise. Where there has been a misidentification or a failure to identify an accused prior to trial, if adequate safeguards are not developed to protect the rights of the accused there may be a violation of due process by an improperly suggestive appearance in court.

We have examined our reported cases, *Soles v. State,* 16 Md. App. 656, 299 A. 2d 502, *Alston v. State,* 11 Md. App. 624, 629, 276 A. 2d 225, *Cummings v. State,* 7 Md. App. 687, 691, 256 A. 2d 894, holding that the trial judge has broad discretion in determining where an accused shall sit in a courtroom, as well as our one reported case holding an accused cannot require a lineup, *Bowen v. State,* 5 Md. App. 713, 249 A. 2d 499. In none of those cases was there a prior misidentification or a failure to identify when the witness was given an opportunity to do so. We have searched for and examined similar holdings outside our jurisdiction. In none of those cases was there a prior misidentification or a prior failure to identify when an identification should have been made.[1]

---

1. The latest cases in each jurisdiction are cited. The earlier cases in each jurisdiction are cited therein. *United States v. Moss,* 410 F. 2d 386 (3d Cir. 1969), *United States v. Munroe,* 421 F. 2d

The rationale of *Coleman v. State, supra,* must prevail where prior to trial a witness has either failed to identify the accused under circumstances in which an identification should have been made or has made a misidentification. In making this holding we in no way depart from our prior holding in other situations that where an accused sits in a courtroom is in the sound discretion of the trial judge; neither do we depart from our holding that an accused in other situations is not entitled to a lineup.

If the State had, absent unusual circumstances such as those attendant in *Stovall v. Denno,* 388 U. S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967), arranged an out of court confrontation between appellant and the eyewitnesses as suggestive as the in-court confrontation under present consideration, we would, under prior decisions of the Supreme Court and this Court, have precluded evidence as to the out of court identifications and would have precluded the witness from making an in-court identification absent a demonstration by the State by clear and convincing evidence, the in-court identifications would be based on an independent source. In *United States v. Wade,* 388 U. S. 218, 241, 87 S. Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967), the Court illustrated some factors that would indicate an identification based on an independent source:

> "[F]or example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the de-

644 (5th Cir. 1970), *United States v. Williams,* 436 F. 2d 1166 (9th Cir. 1970), *People Ex Rel. Blassick v. Callahan,* 279 N.E.2d 1, (Ill. Sup. Ct. 1972), *Moore v. State,* 424 S.W.2d 443, (Tex. Ct. of Crim. App. 1968), and *State v. Brown,* 458 P. 2d 165 (Wash. Sup. Ct. 1969). In one case, *People v. Clark,* 52 Ill. 2d 374, 288 N.E.2d 363 (1972), one witness, as in the instant case, picked out of a lineup a person other than the accused as resembling the criminal. In our view this does not amount to a misidentification.

fendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification."

See *Smith and Samuels v. State,* 6 Md. App. 59, 65, 250 A. 2d 285.

In applying this test we note that the dangers of a suggestive in-court identification leading to a misidentification are not as great as those of a suggestive out of court identification. Where there is a suggestive in-court identification the jurors can observe the witnesses' demeanor and assess the degree of certainty with which the identification is made. In addition, the witness is promptly subject to cross-examination on all facets of his testimony on identification. In such a circumstance, the witness has not previously committed himself and is therefore not called upon to defend a prior selection.

We do not dismiss our concern over the fact that one and perhaps two of the eyewitnesses in the instant case failed to select the accused from a small group of photographs approximately one week after the occurrence. One would expect them to have at least pointed to the accused as a person with features somewhat similar to the criminal but we are aware that individuals do not always appear the same in a picture as in person.[2] When a man is actually seen in court, his expression, the glance from his eyes, the movement of his facial features may much more convince a witness that he has seen the man before than observations of a photograph taken of the accused.

We also note that the identifications here are of importance only to support an accomplice's identification of appellant as the criminal agent. In Maryland such corroboration need be only slight. *Mills v. State,* 12 Md. App. 449, 463, 279 A. 2d 473, *Montgomery v. State,* 17

2. The picture in the instant case was two years old, i.e., when the accused was 14 years of age, but from our comparison with the picture of the accused at the time of arrest there appears to have been but small change in his facial appearance.

Md. App. 119, 300 A. 2d 218. While this does not mean that the rules of *Wade* are not applicable, *Foster v. California,* 394 U. S. 440, 89 S. Ct. 1127, 22 L.Ed.2d 402 (1969), it does indicate that there is less chance of a misidentification than otherwise.

The record shows all the witnesses had several minutes to observe the criminal and each took advantage of the opportunity. Although the witnesses varied somewhat in describing the clothing the criminal was wearing, the record does not indicate any important discrepancy in their various physical descriptions. Although one witness described the assailant to police as being twenty-two years old, she said Witcher, who was sixteen, appeared twenty-two at trial. The particular witness made no prior misidentification and did select his photograph as "look[ing] like the one that did the shooting." A second witness picked out another person in the lineup as "looking like" the criminal. From our examination of the pictures there appears to be some facial similarity between that individual and appellant. We cannot brand this response as a misidentification.

We have already noted that each of the two witnesses with whom we are concerned had ample time in a well lit bar to observe the assailant while the crime was in progress. Witness Townes stated that when she entered the courtroom her attention was drawn to Witcher "because instantly when I looked at him, I remembered." Witness Medley testified he remembered the accused because, "Well, you see a man being killed in front of you and this sort of makes an impression in your mind and if you see this person again, more than likely you will remember this person." Besides the identification by the accomplice, two of the eyewitnesses made statements more indicative of certitude than that the accused "looked like" one of the criminals. We are not concerned with the witness Mealey on the due process question because she did pick out the Witcher picture as looking like one of the criminals. We hold there was an independent source for the identifications and thus, no denial

of due process of law. The identification issue then becomes relevant only as to the weight of the evidence which of course is a question for the trier of facts.

## II

Appellant contends that the State's Attorney made a remark in his closing argument that was so prejudicial as to require a reversal of his convictions.

Appellant extracts the language emphasized below where it appears in context and alleges it to be "highly improper and prejudicial."

> "Eddie Williams told you he lied to the police but that he was telling you the truth in court and I told you in my opening statement to scrutinize his testimony carefully and I tell you again to scrutinize his testimony carefully and you will know the boy is telling the truth. He didn't want to tell the police any more than he had to get off the hook. *He told you himself from the stand that he was taken before the Grand Jury.*
>
> *Why was he taken before the Grand Jury? Because that protects the State and also subjects him—*
>
> Mr. Kandel: I object.
>
> Mr. Richman: — to any —
>
> The Court: What is the basis of your objection?
>
> Mr. Kandel: That's not the evidence.
>
> The Court: There was testimony he was taken before the Grand Jury.
>
> Mr. Kandel: That's all, yes.
>
> The Court: He's arguing concerning his veracity now. I'll overrule your objection.
>
> Mr. Richman: Thank you, Your Honor.
>
> *The reason he was taken before the Grand Jury was because that not only subjected him to*

*punishment for any lie that he would tell here today, but it would also guarantee that he would tell the truth here before you today or yesterday in court.*

I tell you that if you look at his testimony and scrutinize it carefully and compare it to the testimony that you heard from Lorraine Mealey, from Shirley Townes and Howard Medley, it coincides perfectly, step by step, with exactly what occurred on the day of September 30, 1971."

Although it is true the evidence supported the proposition that Williams had testified before the Grand Jury there was no evidence as to why he was taken before the Grand Jury. We think that the complained of language, however, was fair comment made during the course of an oral argument and that it was not misleading to the jury. *Ott v. State,* 11 Md. App. 259, 273 A. 2d 630.

The rule in Maryland concerning the misstatements of law or fact in a closing argument is that unless it appears the jury was actually misled or was likely to have been misled or influenced to the prejudice of the accused, a reversal of a judgment of conviction will not be justified. *Holbrook v. State,* 6 Md. App. 265, 250 A. 2d 904. See *Reidy v. State,* 8 Md. App. 169, 259 A. 2d 66. If we assume the argument to have been improper, the trial court's instructions to the jury concerning statements and arguments of counsel not to be considered evidence, and his direction that they find their facts only from "what you have heard from the witness stand and the exhibits which have been received," sufficiently eliminated any possibility of prejudice.

*Judgments affirmed.*