JOSEPH STANLEY FRANKLIN *v.*
STATE OF MARYLAND

[No. 859, September Term, 1972].

*Decided August 15, 1973.*

The cause was argued before MOYLAN, POWERS and CARTER, JJ.

*Roy D. Cromwell* for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Raymond Thieme, State's Attorney for Anne Arundel County,* and *Martin Wolff, Deputy State's Attorney for Anne Arundel County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

On Thursday evening, February 4, 1971, a light snow lay over central Anne Arundel County. More snow, mixed with freezing rain, was falling through a post-twilight mist. At 7:30 p.m., a 28-year-old kindergarten teacher—wife and mother of two young sons—walked from a physical fitness class at the Anne Arundel Community College into a night of Gothic terror. In at most partial redress, the appellant, Joseph Stanley Franklin, stands convicted by an Anne Arundel County jury of rape and sentenced by Judge George Sachse to life imprisonment.

The appellant takes umbrage 1) at being identified in court by the woman he ravaged, 2) at the observation by the police of a brushed velvet burgundy-colored shirt hanging in the closet of his bedroom, and 3) at the seizure from him of a pair of boxer shorts, which were identified by the victim as being similar to those worn by one of her three assailants and which yielded, upon laboratory examination, a Caucasian limb hair. A brief narration of the macabre attack and of the investigation it set in motion will place these contentions in intelligible context.

At the conclusion of the evening's physical fitness class, the young victim went down to a locker room, where she put on a pair of blue jeans over her tights and leotard. She donned a pair of zippered boots and put on a suede jacket with a fleece lining. Carrying the shirt which she had worn

to the gymnasium, she telephoned her husband at 7:25 p.m. to notify him, because of the icy road conditions, that she was on her way home. She left the building alone and walked across a parking lot about "as large as a football field." The lot was "lit but it was dimly lit." She observed no one else on the entire lot. When she reached her automobile, she threw in her shirt, started up the motor and then got out to scrape ice from the windshield.

She noticed two Negro males approach her from the middle of the lot. They asked her if she had a cigarette. She replied that she had not. They withdrew. She went on to scrape ice from the rear window. Becoming aware that the two males were lingering ominously nearby, she "started to get worried and opened the car door." Suddenly both males grabbed her and blurted out, "You are coming with us." She yelled, "No, I'm not." As they dragged her toward the middle of the parking lot, she resisted by kicking, jumping and trying to hit. She took sudden hope when she spied the headlights of an approaching car. She lurched toward it and started to scream, "hoping that someone would stop" and "render assistance." The car did stop. The appellant opened the passenger door of his two-door Pontiac and his two confederates pushed the victim into the car. As she was shoved into the back seat, "she started screaming louder and trying to resist." The appellant reached over from the front seat and pulled at her shoulders, forced her head down between the bucket seats onto a console between them. The rest of her body was on the rear floor. The appellant "started strangling" her and then pushed a place on the back of her neck. She "started to lose consciousness." She then agreed to stop screaming, "Please, just let me breathe, I won't do anything, just let me breathe." With the appellant behind the wheel, a second assailant on the front seat, and the third assailant in the rear with her, the car drove into the night.

The car drove on for between 10 and 12 minutes. The three man drank from a communal bottle. The young woman pleaded, "You don't know me. What do you want with me? You don't know me. I have two children at home." The brutal explanation followed sharply, "Mother fucking

whitey, we are going to get you, dirty white bitch." The man in back, whom she heard referred to as "Mike," unzipped and removed her boots and pulled off her jeans. The man in front, whom she heard referred to as "Jim or Tim or something like that," ripped off her leotard and her brassiere as "Mike" then tore off her tights. She was completely naked. The appellant, whom she heard referred to as "Joe or Joeso," then turned the car from the main road and proceeded on a dirt road to a lonely wooded area. The car then stopped and turned off all lights.

The appellant and "Jim or Tim" got out and left their prisoner alone with "Mike." "Mike" commanded, "Suck on me." She replied, "No, I can't do that." He renewed his demand, "You dirty bitch, suck on me." She repeated, "No, I can't." He then said, "Where is that gun and we'll see about that." He grabbed her head and pushed it down upon his penis and she complied. When the act of fellatio was completed, "Mike" pushed her back onto the seat and proceeded to have sexual intercourse with her. He then left the car and joined his confederates outside, leaving the victim momentarily alone.

The respite was fleeting. The appellant got back into the front seat on the driver's side. "Mike" took the front passenger seat. "Jim or Tim" then moved into the back with the frightened victim. He commanded, "Suck on me." She begged, "I'll be sick." He angrily ordered, "Mother fucker, you are not going to be sick." She insisted, "I will. I can't do that." He then said, "Where is the goddam gun?" The victim winced as something sharp, from the direction of the front seat, poked into her naked ribs. "Jim or Tim" inquired again as to the whereabouts of the gun. "Mike" responded, "Don't worry about it" and continued to push something into the ribs of the young teacher. She then submitted to "Jim or Tim's" desire for fellatio. When that act was finished, she was pushed again onto the back seat and subjected to yet another act of sexual intercourse, this time by "Jim or Tim." Throughout the course of both violations by her second assailant, the two in the front seat continued to drink.

The appellant then opened the left front door and got out

of the vehicle, so that he could change places with "Jim or Tim." During the exchange, he took off his pants. The victim noticed his white boxer shorts with "little boxes design on them." The appellant then laid the victim on the back seat and subjected her to a third act of sexual intercourse.

The orgy of sadism was not yet at an end. The sixth and seventh ravages were to be brutishly simultaneous. "Mike" changed places with the appellant for another turn at the terrorized victim. She was now suspended between the front and back seats. Her head and shoulders rested on the back seat; her torso stretched onto the console between the bucket seats of the front. "Mike" demanded that she "suck on him again." With her head down on the back seat, she again submitted. "Jim or Tim," not yet sated, was meanwhile mounting her body as it extended through to the front of the car and again had sexual intercourse with her, even as his companion was ravishing the same body inches away.

When all appetites were ultimately slaked, the threesome announced to their young captive, "We are going to read about you in the paper tomorrow." She read that sentence, in her mind, as a warrant of death. One of the attackers volunteered, "I'd like to take her home with me." Another said, "Come on, let's get out of here." The appellant bound her hands behind her with her belt; he covered her eyes by tying her tights about her head. With that, she was unceremoniously shoved out of the car and her predators drove off. Her clothes were strewn in the snow at her feet, as she trembled — bound, blindfolded and naked — in the desolation of the empty night.

Marvin Cole was an acquaintance of the appellant. He had seen the appellant at between 5 and 5:30 that afternoon at Richman's Drugstore in Annapolis. The appellant was driving his car and was in the company of Charles Simms. The appellant invited Cole "to go out and make a hustle." Cole declined. At between 10 and 10:30 that night, Cole saw the appellant again, in front of Brown's Tavern on Clay Street in Annapolis. The appellant was part of a threesome: 1) himself, Joseph Franklin (the rape victim's "Joe or Joeso"?); 2) Michael Cager (the rape victim's "Mike"?) and 3)

Charles Simms (the rape victim's "Jim or Tim or something like that"?). The appellant bragged to the stay-at-home Cole that those who had gone on the hustle had "got over decent." Cole, curious, asked him for detail. The appellant boasted of their savage depredations, "We went up Anne Arundel Community College and grabbed a girl and *ripped her off decent.*" Cole particularized, "They said they took her back, down back where Fishpaw's Junk Yard is down back there and they said they did everything they could to her. And they put her out of the car and they took off." Shortly thereafter, the appellant left Cole's company, driving away in his car.

Meanwhile, "down back where Fishpaw's Junk Yard is," the young teacher had managed to untie her hands and to remove the blindfold from her eyes. She found her jeans and boots and put them on. Although her suede jacket was later found not too far away, she missed it in the dark. As she groped for her clothing in the snow, she heard a car on the road and fled into the woods, terrified that her attackers were returning. Later, spying a distant light, she made her way to an inhabited house trailer. She immediately called her husband and the State Police. The victim thought that she reached the shelter of the trailer at between midnight and one a.m. It was only 8:42 p.m. She revealed with poignant eloquence her state of mind, "Time that night stood still."

An examining physician at the University Hospital in Baltimore found that the victim was suffering from "tender bruises" on her left thigh, on her left arm and upon her thorax (the upper body between the neck and the abdomen). Scratches were found on her back. A vaginal smear revealed sperm cells, notwithstanding the fact that the victim was in the midst of her menstrual period.

A highly professional investigative effort was immediately put in motion. Working backward from the house trailer and looking for a dirt road, Trooper Robin Thayer of the State Police found, near the shoulder of Jones Station Road where it is intersected by a small dirt road, the brown suede jacket of the victim. Trooper Thayer noticed

tire marks leading from the hard surface onto the dirt road and back again. He summoned aid and the tread marks were photographed. Trooper Thayer covered the tracks to preserve them from the snow, then turning to rain. Det. Sgt. Gary Alan Coonradt, a 13-year veteran with the Maryland State Police and an expert in tire print identification, was called to the scene. He determined that four tracks from a single vehicle had made all of the impressions by leaving the hard road, going back between 150 and 200 feet into a wooded area, turning around and then returning to the hard road. He made plaster molds of the track marks. He verified what had already been noted by Trooper Thayer earlier that two of the tires were regular tires and the other two were snow tires.

The rape victim had described the car in which she had been held captive as a 1965 or 1966 Pontiac or Chevelle, dark blue or black in color. It had decals on the rear window and an empty place on the back ledge where a speaker had been removed. It had bucket seats, rolled upholstery and a gearshift in the floor. When Trooper James Mollman heard that description on the police radio, he recalled that he had stopped the appellant in just such a car on two occasions. He alerted his fellow officers to look for Maryland tags HH 9490 and to focus in their search upon the 4th Ward in the City of Annapolis. Armed with that information, Sgt. Walter Perkins of the Annapolis City Police Department found the appellant's car on Clay Street in Annapolis at 1:32 a.m. It was a black Pontiac, 1965 model, with decals on the left and right rear windows, a hole in the ledge where a missing speaker had been, rolled upholstery, bucket seats and a gearshift protruding from the floor. The gearshift was topped by a T-bar rather than by the standard ball, which unusual feature had been described by the rape victim. The vehicle was also observed to contain a bottle of liquor, corresponding again with the story as given by the victim.

Sgt. Robert Thomas, of the Maryland State Police, who had earlier supervised the photographing of the tire marks at the crime scene, proceeded to Clay Street to meet Sgt. Perkins. He observed that two of the tires on the appellant's

automobile were standard and that the other two were snow tires. He examined the tracks in the snow immediately adjacent to the appellant's automobile and found that they matched the tire tracks from the crime scene. He photographed the tracks. (Later expert testimony by Sgt. Coonradt verified the tire identifications, both with respect to the four treads individually and with respect to the sequence of the tires as they were placed on the automobile. In the opinion of Sgt. Coonradt, the possibility of some other car having four such varying treads in just such a sequence was exceedingly remote.) Sgt. Thomas went immediately to the Annapolis Barracks where he first summonsed the State Police Crime Laboratory and then contacted Assistant State's Attorney Martin Wolff for purposes of preparing a search warrant for the automobile. The search warrant was signed by Judge James L. Wray at his home at 7 a.m. on February 5. It was served upon the appellant at 192 Clay Street at 9 a.m., immediately prior to its execution on his automobile parked just outside.

A microscopic investigation was made of the interior of the car. Kenneth B. Cooper, an F.B.I. Agent specializing in hair and fiber identification, compared samples of head, body and pubic hair from the victim with hairs found in the appellant's automobile. He testified that microscopic examination of hair could establish the race of the donor. He pointed out further that head and pubic hairs, unlike limb hairs, possess enough identifying characteristics — cuticle, medula, cortex, cell structure, etc. — to permit a significant comparison, although the science will not permit the absolute identification of a single individual. A brown Caucasian head hair was located on the automobile console between the bucket seats. A similar head hair was taken from the back seat of the automobile. A similar head hair was taken from the front seat. All three of these head hairs had been forcibly removed. All three of these head hairs matched, in all identifying characteristics, the head hair of the victim. In addition, two brown Caucasian pubic hairs were recovered from the back seat of the automobile and three brown Caucasian pubic hairs were recovered from the

rear floor of the automobile. All five of these hairs had been forcibly removed from the body and all five matched, in all identifying characteristics, the pubic hair sample of the victim. A few black Negroid head hairs found upon the jeans, upon the leotard and upon the tights of the victim were insufficient in quantity for microscopic comparison.

In this ever-tightening web of guilt were intertwined the strands of evidence now in issue.

### The Seizure of the Boxer Shorts

When the police entered 192 Clay Street at 9 a.m. on February 5, the appellant was upstairs asleep. The appellant's girlfriend, Irene Richardson, answered the door and showed the police in. The police went to the bedroom and awakened the appellant. They read him the search warrant and served a copy of it upon him. The police testimony is very equivocal as to whether the appellant was then asked to accompany them to the State Police Barracks or whether he was taken there under arrest. In either event, he ended up at the State Police Barracks some short time thereafter. He was subjected to interrogation, which yielded only exculpatory statements. A phone call from the police to Assistant State's Attorney Wolff caused the appellant to be released. He was ultimately arrested approximately one week later.

Before leaving the State Police Barracks on February 5, however, the appellant turned over the white boxer undershorts which he was wearing. He both cut and pulled from his body, samples of head hair and of pubic hair. The furnishing of the hair samples is totally academic, since no microscopic comparison for identification purposes was ever made and the samples were not introduced in evidence.

The boxer shorts, on the other hand, had real evidentiary significance. The rape victim identified them as being similar in every respect to those she had seen upon the driver, whom she identified as the appellant, as the dome light went on when he opened the car door and entered the back seat to rape her. She described with minute detail the

small design upon them "like little boxes." A scraping of the shorts also produced a hair, which upon microscopic examination by the F.B.I. expert was determined to be a brown Caucasian limb hair. The appellant's attempt at trial to explain this away by attributing it to residue picked up in public laundromats was desperately ineffective and served only to highlight its significance.

We hold that the seizure of the boxer shorts was constitutionally unassailable for three independent reasons.

### Consent

Sgt. Thomas testified that he notified the appellant of the appellant's imminent release before the boxer shorts or the hair samples were asked for. The appellant was shortly thereafter asked if he would consent to furnish the hair samples and to turn over to the police the undershorts. According to Sgt. Thomas, "He was advised that he didn't have to, that it was just to assist us in our investigation if he would and if he had nothing at all to do with the crime, it might clear him." Sgt. Thomas made it clear that the release was not contingent upon the appellant's cooperation, "Yes sir, he knew at that point that he was going to be released regardless and he knew prior to my asking for his skivvy shirt, trousers, head and pubic hair, that he was going to be released." Although the appellant contested this testimony, other police officers verified it.

At a pretrial suppression hearing, Judge Matthew Evans found that the appellant had voluntarily consented to turning over the hair samples and the boxer shorts. Upon our independent constitutional review, and giving great deference to the findings by Judge Evans as to the first-level facts of who did or did not say what to whom, *Walker v. State*, 12 Md. App. 684, 280 A. 2d 260, we resolve the ultimate, second-level fact of voluntary consent *vel non* as did Judge Evans below. *Schneckloth v. Bustamonte*, 412 U. S. 218, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973); *Lopata v. State*, 18 Md. App. 451, 307 A. 2d 721. And see *Simms v. State*, 4 Md. App. 160, 242 A. 2d 185.

*Pursuant to Warrant*

At the suppression hearing, the appellant did not question the validity of the search and seizure warrant nor the adequacy of the probable cause upon which it was based. Both the appellant and the State moved forward to consider the subsequent seizures and, remarkably, looked at the later seizures only in the frames of reference of 1) consent and 2) search incidental to a lawful arrest. Apparently, no one read the full warrant, the adequacy of which was assumed by all parties.

Totally independent of whether any arrest is or is not made, a warrant to search may apply to the person of an individual just as it applies to automobiles or fixed premises. In *Salmon v. State*, 2 Md. App. 513, 519-521, 235 A. 2d 758, Chief Judge Murphy thoroughly analyzed this not-to-be disputed proposition of law. Indeed, Article 27, Section 551, provides, in pertinent part:

> "Whenever it be made to appear to any judge . . . of any of the circuit courts in the counties of this State . . . by a written application signed and sworn to by the applicant, accompanied by an affidavit or affidavits containing facts within the personal knowledge of the affiant or affiants, that there is probable cause, the basis of which shall be set forth in said affidavit or affidavits, to believe that . . . any property subject to seizure under the criminal laws of the State is situated or located on the person of any such individual . . . then such judge may forthwith issue a search warrant directed to any duly constituted policeman, or police officer authorizing him to search such suspected individual . . ."

A look is in order at the search warrant in this case. The probable cause pointed just as tellingly at the occupants of the car, particularly the driver-owner, as it did at the automobile itself. The warrant directed the search for and seizure of human hair and articles of clothing. Such incriminating evidence would attach itself to rapists just as

surely as it would attach to the rape vehicle. The application for the search warrant asked not only for authorization to enter and search the vehicle, but also for authorization "(b) To search the persons who may be participating in said criminal activities." Most significantly, the warrant itself commanded the police, *inter alia:*

> "(b) To search the owner of the vehicle above described and all other persons who may be participating in said criminal activities.
> (c) To seize any evidence of human hair, articles of clothing, and all other evidence, paraphernalia, and contraband used in or incident to the operation or conduct of said criminal activities.
> (d) And bring the said persons, evidence, paraphernalia and contraband before me, the subscriber, or some Associate Judge of the Fifth Judicial Circuit, Anne Arundel County, State of Maryland aforesaid, to be dealt with and disposed of according to law."

It is pre-eminently clear that the hair samples and the boxer shorts were the very type of evidence contemplated by the warrant and that the seizure of such evidence from "the owner of the vehicle" was commanded by the warrant.

### Without Reliance on the Warrant

The constitutionality of the seizure of the boxer shorts need not rest necessarily upon either the predicate of voluntary consent or that of a valid search and seizure warrant. The seizure now at issue would have been constitutionally sound even absent a warrant and even absent consent. The supporting theory for such a warrantless seizure, however, will vary, depending upon whether there was or was not an antecedent arrest. Testimony was extremely equivocal on this point and the hearing judge, relying upon his finding of consent, did not have to resolve it. Nor do we, since the seizure was valid in either event. One thing, at least, is clear: the appellant, while

at the State Police Barracks, was either under arrest, or he was not.

### The Arrest Alternative

If the appellant was under arrest, the arrest — though warrantless — was indubitably valid. The felony of rape had most emphatically been committed. Every shred of probable cause which pointed to and supported the search warrant for the appellant's automobile also pointed to the appellant as the owner of that automobile. Beyond the already strong probable cause recited in the warrant application, there was, in addition, the correspondence of the appellant's first name — "Joseph" — with the "Joe or Joeso" ascribed by the victim to the driver of the car. There was, moments before the arrest, the additional observation of the appellant as fitting the physical description of the driver-assailant given by the victim of the assault. There was, also moments before the arrest, the additional observation of the boxer shorts, still being worn and presumably having been worn the night before, which also fit the description, given by the victim, of those worn by the driver-assailant. There was, also in those final moments before the arrest, the open viewing of the burgundy-colored velvet shirt hanging in the appellant's closet, which also matched the description given by the victim of the shirt worn by the driver-assailant the night before. This combination of circumstances might, indeed, be proof of guilt beyond a reasonable doubt. A fortiori, there was probable cause to arrest the appellant for rape.

Granted a valid arrest, the seizure of the shorts would follow clearly as a legitimate incident thereof. The undershorts being worn by an arrestee fall unquestionably within the contemplation of "the person of the arrestee" — the search of which is universally permitted as an incident of any arrest. Chimel v. California, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969); Brown v. State, 15 Md. App. 584, 292 A. 2d 762. Evidence of rape would, moreover, include by definition identifying characteristics of the clothing of the rapist, as well as possible seminal stains, possible bloodstains and possible head, body and pubic hairs upon the clothing of the rapist.

If the appellant was arrested (and he was taken to the barracks in handcuffs), then the seizure of the shorts follows as a constitutionally unassailable incident of that arrest.

## The Non-Arrest Alternative

What, on the other hand, if the appellant was not under arrest? The officers hedged significantly in their testimony in that regard. Though admitting that they would have invoked formal arrest procedures had the appellant declined to accompany them to the barracks voluntarily, they testified that his ready compliance obviated the taking of that next step. The Assistant State's Attorney's cautious telephoned directive to release the appellant because there was not enough to hold him, added to the ambiguity of his status during the several hours between being awakened and being released.

The short answer is that the result will be the same. Only the supporting theory for that result will differ. Assuming some mere temporary detention less than formal arrest, the seizure of the boxer shorts would be constitutional under the Supreme Court's newly articulated and intriguing exception to the warrant requirement as announced in *Cupp v. Murphy*, 412 U. S. 291, 93 S. Ct. 2000, 36 L.Éd.2d 900 (1973).

*Cupp v. Murphy* is factually so analogous to the case at bar as to make its application compelling. To hold that *Cupp v. Murphy* is dispositive of the present issue is easy. The more difficult task, for future guidance, is to frame the general statement of what *Cupp v. Murphy* and now this case actually stand for.

The majority opinion of Justice Stewart consumes only some three pages. It was joined in by six of his colleagues. Although the six colleagues all participate (one of them twice) in four separate concurring opinions, the differences developed in the concurring opinions are only peripheral.[1]

One starts with the basic constitutional rule that

---

1. Even the dissenters, Justices Douglas and Brennan, go their separate ways, filing two separate dissents. Indeed, the dissent of Justice Brennan is almost a concurrence.

"searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U. S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *Coolidge v. New Hampshire*, 403 U. S. 443, 454-455, 91 S. Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971). The most venerable of these exceptions, dating from early common law, is the universally recognized right of an arresting officer to search his arrestee as an incident of the arrest. The long debate over this exception dealt only with the breadth of the search perimeter. The exception is now fully articulated and analyzed in *Chimel v. California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969). There has been recognized, since 1925, the "automobile exception." *Carroll v. United States*, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). The exigent circumstances exception was first articulated in 1967 in *Warden v. Hayden*, 387 U. S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782. Although limited in scope, the "stop and frisk" exception was recognized in 1968 in *Terry v. Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889. The Plain View Doctrine was recognized as an autonomous exception in 1971 in *Coolidge v. New Hampshire, supra.* Although better analysis would look to consent searches as cases of the Fourth Amendment-inapplicable, under general waiver considerations, rather than as an exception to the warrant requirement, many opinions conveniently add the consent search to this list of exceptions. Whatever its pigeonhole, it is now well-articulated in *Schneckloth v. Bustamonte, supra.*

Despite Justice Stewart's passing attempt to squeeze the *Cupp v. Murphy* rationale into the framework of *Chimel* by stretching the reasoning of *Chimel*, which attempt was pointedly not concurred in by Chief Justice Burger and Justices Marshall and Blackmun, *Cupp v. Murphy* literally defies classification in any of the pre-existing pigeonholes. Though probably of limited utility, it must now join the list as an autonomous exception to the warrant requirement in its own right. Until general usage has settled upon some

acceptable shorthand, the awkwardly long label for the new exception appears inevitably to be "search incident to a detention, based upon probable cause but not amounting to arrest, for readily destructible evidence." Justice Stewart recognized the elements in his conclusion, at 36 L.Ed.2d 906:

> "On the facts of this case, considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments."

The initial critical element in *Cupp v. Murphy,* as in the case at bar under the present assumption, is that there was no arrest. Had there been an arrest, the case would have been routinely pedestrian. The right to scrape the fingernails of one arrested for a fresh murder by strangulation, leaving manifest scratch marks on the throat, would have been a commonplace incident of the arrest. No further discussion dealing with the limited nature of the intrusion or with the highly evanescent character of the evidence would have been called for. The search would have been permitted whether the intrusion was fleeting or protracted and whether the evidence was evanescent or enduring. The unavailability of classic "search incident" justification was because of the fact that Murphy was never arrested. When his estranged wife was found strangled, he was telephoned at his suburban home and voluntarily came to the Portland, Oregon, Police Station for questioning. While there, a policeman noticed a spot, which might have been dried blood, on Murphy's finger. He asked for permission to take fingernail scrapings. Murphy refused. The police, nonetheless, took the scrapings over his protest. Evidence of blood, traces of skin and fabric from his wife's nightgown made his conviction of murder a foregone conclusion. After the scrapings had been taken, however, Murphy was released and was ultimately arrested a month later. Similarly, the appellant at bar was released after turning over his shorts and was ultimately arrested a week

later. The Court made it clear, at 36 L.Ed.2d 904-905, that what was involved was a bare detention and not an arrest:

> "It is also undisputed that the police did not obtain an arrest warrant nor formally 'arrest' the respondent, as that term is understood under Oregon law. The respondent was detained only long enough to take the fingernail scrapings, and was not formally 'arrested' until approximately one month later. Nevertheless, the detention of the respondent against his will constituted a seizure of his person, and the Fourth Amendment guarantee of freedom from 'unreasonable searches and seizures' is clearly implicated . . . As the Court said in *Davis v. Mississippi*, . . . 'Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' "

The Supreme Court next established a complete new species of detention — detention supported by probable cause for arrest notwithstanding the failure to consummate the arrest. This detention was a very different animal from the detention contemplated by *Terry v. Ohio, supra,* and *Sibron v. New York,* 392 U. S. 40, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968). In the "stop and frisk" situations, detention need only be predicated upon "a reasonable suspicion" or "a reason to believe" and not upon probable cause. Detention, on that less substantial predicate, may never, however, give rise to a search for even highly evanescent or readily destructible evidence. It may serve as a basis only for a "frisk" for weapons. The creation of the new species of detention was necessary to distinguish the *Cupp v. Murphy* situation from that condemned in *Davis v. Mississippi,* 394 U. S. 721, 89 S. Ct. 1394, 22 L.Ed.2d 676 (1969).

In *Davis,* the Supreme Court refused to countenance the "investigatory detention" as a basis for gathering evidence — in that case, fingerprints — from mere suspects. In *Cupp v. Murphy,* the Court, at 36 L.Ed.2d 905, was very careful to

use the additional element of probable cause to distinguish this detention from that detention:

"The respondent in this case, like Davis, was briefly detained at the station house. Yet here, there was, as three courts have found, probable cause to believe that the respondent had committed the murder. The vice of the detention in *Davis* is therefore absent in the case before us."

In the case at bar, there was also this additional element of probable cause to arrest the appellant for rape, notwithstanding the assumed failure to consummate that arrest.

*Cupp v. Murphy* was very careful to point out, however, that even a "probable cause detention" will not give rise to a full "search incident" of the person detained. The Court said, at 36 L.Ed.2d 906:

"[W]e do not hold that a full *Chimel* search would have been justified in this case without a formal arrest and without a warrant. But the respondent was not subjected to such a search."

The Court rather analyzed the ready destructibility of the evidence under the fingernails. It pointed out that Murphy was already alert to the possible danger and was making efforts to conceal his hands. Although not necessarily setting it up as a *sine qua non*, the Court at least pointed out the limited nature of the intrusion. It referred to the probable cause detention as justifying "the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails."

In the case at bar, we see a striking analogy to the fingernail scrapings of *Cupp v. Murphy*. The possible seminal stains, bloodstains or head, body or pubic hairs that might be discovered by an immediate examination of the undershorts would certainly be, we hold, evidence of a "highly evanescent" nature. Even if the appellant did not consent to the seizure of the shorts and even if the appellant

was not under arrest, we believe the search and seizure was constitutionally valid, as a now-recognized exception to the warrant requirement, by virtue of being a "search incident to a probable cause detention for highly evanescent evidence."

## *The Observation of the Burgundy Shirt*

The seizure of the burgundy-colored velvet shirt is not at issue, since neither the shirt nor the results of any examination of the shirt were received in evidence. The testimony with respect to the shirt consisted simply of a policeman's observation of it as it hung in open view in the bedroom closet of the appellant. Whether the policeman went to the bedroom to read and serve the search warrant for the automobile upon the appellant, to search the appellant pursuant to that warrant, to arrest the appellant or to invite the appellant to accompany him to the State Police Barracks, that policeman was standing where he had a right to be. He made no search for the shirt. He simply saw what was there to be seen, from his constitutionally sound vantage point. The Fourth Amendment is in no way offended.

Even if the seizure of the shirt were before us, it would be a classic occasion for the invocation of the Plain View Doctrine. For any or all of the above reasons, the policeman had already validly crossed the protected threshold. Inadvertently seeing something in plain view subject to seizure, he would be permitted to seize it. *Coolidge v. New Hampshire, supra; Brown v. State, supra.*

## *The In-Court Identification*

The appellant's contention that the rape victim should not have been permitted to make an in-court identification is utterly without merit. He simply asserts a few facts which amount to no more than "jury argument." At the outset of the trial, the appellant moved that the judge order, then and there, a lineup. He cites no authority to indicate that he was entitled to one, and we know of none. Indeed, the law is clear

that a defendant has no constitutional right to a lineup. *Witcher v. State*, 17 Md. App. 426, 302 A. 2d 701; *Alston v. State*, 11 Md. App. 624, 276 A. 2d 225.

The appellant cites the failure of the victim to select the appellant's photograph on several occasions when photographs were shown to her. The entire point goes only to the weight of the subsequent in-court identification. The victim was shown a total of 172 photographs on five separate occasions. She was unable to identify anyone positively from the photographs. Indeed, on three of the five occassions, photographs of the appellant were not even included in those shown to her. There was never any impermissible suggestiveness and the victim never picked any photograph out. There is no question of taint.

The victim was firm in her identification. She did not waver under cross-examination:

> "Q. Can you tell us . . . tell the Court at this point, whether beyond a moral certainty, for example, this is one of the men involved?
> A. Yes.
> Q. This is?
> A. Yes.
> Q. And you are satisfied it is?
> A. Yes, I am."

The victim was resolute that she remembered her assailant from the night of the rape and was not influenced by seeing him in the Court House or at the trial table. She pointed out that on the night of the rape, the whiteness of the snow provided some illumination. More significantly, the domelight went frequently on as her three assailants got in and out of the car and changed places with each other. She gave significantly detailed and accurate descriptions of all three assailants, including a description of the appellant. She indicated that she got a good look at his face when he turned around on a number of occasions from the front seat and an even more indelible impression when he moved into the back seat to rape her. She particularized that she was

able to identify him because of "his build, shoulders, shape of his face, his height." She reiterated that her identification of him in court was "beyond any reasonable doubt."

The weight of that identification was for the jury. We see no legal defect in it whatsoever.

*Judgment affirmed.*